UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

- v. -

MIGUEL FRANCISCO MORA NUNEZ
and CHRISTHIAN AYBAR-BERROA,

                      Defendants.

S1 25 Cr. 367 (LAP)


**REPLY MEMORANDUM OF LAW IN SUPPORT OF
CHRISTHIAN AYBAR-BERROA'S MOTION TO DISMISS
THE SUPERSEDING INDICTMENT**


FEDERAL DEFENDERS OF NEW YORK, INC.
Neil P. Kelly
52 Duane Street, 10th Floor
New York, New York 10007
(212) 417-8700
neil_kelly@fd.org

*Counsel for Christhian Aybar-Berroa*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES .................................................................................................... ii

INTRODUCTION .................................................................................................................. 1

ARGUMENT ......................................................................................................................... 2

I.      The Second Amendment's Protects Unauthorized Aliens ................................... 2

II.     The Government Has Not Established that 18 U.S.C. § 922(g)(5)(A) Is Supported by
        A Relevant and Similar Historical Tradition of Firearms Regulation .............................. 5

        A.      The government's proffered historical analogues establish no tradition ............... 5

        B.      The government's proffered analogues are not relevant ........................................ 7

CONCLUSION ...................................................................................................................... 11

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Antonyuk v. James,*
    120 F.4th 941 (2d Cir. 2024) ................................................................. 3

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ................................................................. 1, 3, 4, 9

*Johnson v. M'Intosh,*
    21 U.S. 543 (1823) ................................................................. 9

*Kanter v. Barr,*
    919 F.3d 437 (7th Cir. 2019) ................................................................. 3, 4

*McDonald v. City of Chicago,*
    561 U.S. 742 (2010) ................................................................. 1

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
    597 U.S. 1 (2022) ................................................................. *passim*

*Nunn v. State,*
    1 Ga. 243 (1846) ................................................................. 4

*United States v. Carbajal-Flores,*
    143 F.4th 877 (7th Cir. 2025) ................................................................. 2

*United States v. Huitron-Guizar,*
    678 F.3d 1164 (10th Cir. 2012) ................................................................. 2, 8

*United States v. Jimenez,*
    895 F.3d 228 (2d Cir. 2018) ................................................................. 2

*United States v. Jimenez-Shilon,*
    34 F.4th 1042 (11th Cir. 2022) ................................................................. 2

*United States v. Perez,*
    6 F.4th 448 (2d Cir. 2021) ................................................................. 1, 2, 6, 8

*United States v. Rahimi,*
    602 U.S. 680 (2024) ................................................................. *passim*

*United States v. Torres,*
    911 F.3d 1253 (9th Cir. 2019) ................................................................. 2

*United States v. Verdugo-Urquidez*,
  494 U.S. 259 (1990)..................................................................................... 2

*Worcester v. Georgia*,
  31 U.S. 515 (1832)..................................................................................... 10

*Zherka v. Bondi*,
  140 F.4th 68 (2d Cir. 2025) ...................................................................... 1, 3, 4

**CONSTITUTIONAL PROVISIONS**

U.S. Const. Art. I § 2 ................................................................................ 10

U.S. Const. amend. II................................................................................. 1

U.S. Const. amend. XIV ............................................................................ 10

**STATUTES**

18 U.S.C. § 922(g)(5)(A) ................................................................... *passim*

**OTHER AUTHORITIES**

Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep
  Arms in Early American: The Legal Context of the Second Amendment*,
  25 LAW & HIST. REV. 139 (2007) .............................................................. 6

Saul Cornell & Nathan DeDino, *Well Regulated Right: The Early American
  Origins of Gun Control*, 73 FORDHAM L. REV. 487 (2004) ........................ 5

Philip P. Frickey, *Marshalling Past and Present: Colonialism, Constitutionalism,
  and Interpretation*, 107 HARV. L. REV. 381 (1993)...................................... 9

Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous
  Persons from Possessing Arms*, 20 WYO. L. REV. 249 (2020) ..................... 5

James Lindgren & Justin L. Heather, *Counting Guns in Early America*,
  43 WM. & MARY L. REV. 1777 (2002) ....................................................... 4

Joyce Lee Malcolm, TO KEEP AND BEAR ARMS: THE ORIGINS OF AN ANGLO-
  AMERICAN RIGHT (1996) ......................................................................... 6

Jamin B. Raskin, *Legal Aliens, Local Citizens: The Historical, Constitutional
  and Theoretical Meanings of Alien Suffrage*, 141 U. PA. L. REV. 1391 (1993) ........... 4

Christhian Aybar-Berroa, through his undersigned counsel, respectfully submits this reply memorandum of law in support of his motion to dismiss the Superseding Indictment, Doc. 25 ("Mot."), and in response to the government's opposition, Doc. 26 ("Opp'n").

## **INTRODUCTION**

Like the other rights guaranteed by the Bill of Rights, the Second Amendment does not apply selectively, based on immigration status. The right to bear arms "is not a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 70 (2022) (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010)). It is a "natural" and "inherent right." *District of Columbia v. Heller*, 554 U.S. 570, 612 (2008).

The government seeks to diminish this right at each step of the *Bruen* analysis. First, the government contends that the Second Amendment protects only "law-abiding citizens"—a reading that the Second Circuit has repeatedly rejected. *See Zherka v. Bondi*, 140 F.4th 68, 76 (2d Cir. 2025) (rejecting argument that felons—who are definitionally not law-abiding—are unprotected by the Second Amendment); *United States v. Perez*, 6 F.4th 448, 452 (2d Cir. 2021) (recognizing that "at least some non-citizens are covered by the Second Amendment" (citations omitted)). Second, the government fails to identify relevant analogues that establish a historical tradition justifying 18 U.S.C. § 922(g)(5)(A)'s infringement on the Second Amendment right. *See United States v. Rahimi*, 602 U.S. 680, 700 (2024).

Regardless of Mr. Aybar-Berroa's immigration status, he is among "the people" protected by the Second Amendment. Because the government has not shown that 18 U.S.C. § 922(g)(5)(A) is relevantly similar to firearms regulations within our Nation's historical tradition, the Court should hold this provision unconstitutional and dismiss the Superseding Indictment.

## ARGUMENT

### I.    The Second Amendment's Protects Unauthorized Aliens

The Second Amendment does not limit the right to bear arms to "citizens" or "law-abiding citizens"; the text confers it broadly on "the people." U.S. Const. amend. II. In the only Supreme Court case to consider the scope of the term "the people," the Court defined it to cover "a class of persons who are part of the national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990). Aliens without immigration status intentionally residing in the United States are such persons.

The government's atextual attempt to limit the Second Amendment to "law-abiding citizens" rests on the Supreme Court's use of the word "citizens" in cases that did not address who is among "the people" with the right to bear arms. *See* Opp'n at 8–9. Two Second Circuit panels considered these dicta and concluded that "[a]lthough the [*Heller*] Court uses 'citizens,' presumably at least some non-citizens are covered by the Second Amendment." *United States v. Jimenez*, 895 F.3d 228, 233 n.1 (2d Cir. 2018); *Perez*, 6 F.4th at 452.  The majority of courts of appeal to address the question have declined to hold that the Second Amendment does not cover aliens. *See United States v. Carbajal-Flores*, 143 F.4th 877, 882 (7th Cir. 2025) (declining to hold illegal aliens are not among "the people"); *United States v. Torres*, 911 F.3d 1253, 1261–62 (9th Cir. 2019) (assuming without deciding that unlawful aliens are among "the people"); *United States v. Huitron-Guizar*, 678 F.3d 1164, 1167–70 (10th Cir. 2012) (same); *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1045–46 (11th Cir. 2022) (same).

At base, the government's argument is that the term "the people" (as the Founders used it in the late 1700s) refers to the "political community" (a term introduced only in 2008, in *Heller*) and that the "political community" includes only citizens. *See* Opp'n at 10. But *Heller* never

defined "the people" or "the political community" as "citizens." The phrase "political community" appears only once in *Heller*, as dicta, in a discussion of whether the operative clause of the Second Amendment is limited by the prefatory "militia" clause:

> [I]n all six other provisions of the Constitution that mention "the people," the term unambiguously refers to all members of the political community, not an unspecified subset . . . . This contrasts markedly with the phrase "the militia" in the prefatory clause. . . . Reading the Second Amendment as protecting only the right to "keep and bear Arms" in an organized militia therefore fits poorly with the operative clause's description of the holder of that right as "the people." *Heller*, 554 U.S. at 580.

*Heller* thus explained that "the people" was broader than those subject to militia service; it did not define "the people" as "citizens." Moreover, in *Zherka*, the Second Circuit rejected the assertion that the Second Amendment right belongs only to "law-abiding, responsible citizens." *See* 140 F.4th at 76. The government conspicuously does not mention *Zherka* in its opposition.

The government's attempt to shoehorn history and tradition into the first step of the *Bruen* analysis has been foreclosed in this Circuit. Opp'n 14–18; *see Zherka*, 140 F.4th at 75–77 (drawing on no history or tradition to determine whether the Second Amendment protects felons); *Antonyuk v. James*, 120 F.4th 941, 981–82 (2d Cir. 2024) (noting that the Fifth and Third Circuits applied history and tradition to determine whether the government may restrict the right, not who has it in the first instance). Nor is this approach constitutionally sound. As then-Judge Barrett explained, "[t]here are competing ways of approaching the constitutionality of gun dispossession laws. Some maintain that there are certain groups of people—for example, violent felons—who fall entirely outside the Second Amendment's scope. Others maintain that all people have the right to keep and bear arms but that history and tradition support Congress's power to strip certain groups of that right." *Kanter v. Barr*, 919 F.3d 437, 451–52 (7th Cir. 2019) (Barrett, J., dissenting). As then-Judge Barrett found, and the Second Circuit later agreed in

3

*Zherka*, "the latter is the better way to approach the problem." *Id.*; *Zherka*, 140 F.4th at 76. Thus, whether the Second Amendment applies turns not on who the actor is, but on "individual[] conduct." *Bruen*, 597 U.S. at 17–18. Here, the government does not dispute that alleged conduct, possessing ammunition, is covered by the Second Amendment's plain text.

Additionally, the Supreme Court observed that "the *inherent* right of self-defense has been central to the Second Amendment right." *Heller*, 554 U.S. at 628 (emphasis added). This "natural right" belonged to "the whole people, old and young, men, women and boys, and not militia only." *Heller*, 554 U.S. at 612–13 (quoting *Nunn v. State*, 1 Ga. 243, 251 (1846)). "Natural" and "inherent" rights are not dependent upon citizenship or political participation. Women did not obtain the right to vote until the Nineteenth Amendment was ratified in 1920.[1] Yet "women" were among the "whole people" protected by the Second Amendment. *Nunn*, 1 Ga. at 251; *see also* James Lindgren & Justin L. Heather, *Counting Guns in Early America*, 43 Wm. & Mary L. Rev. 1777, 1813 (2002) (analyzing 18th and early 19th century probate inventories, which revealed that between 18% and 38% of percent of female wealth holders owned firearms). The same was true of unpropertied men. There is no link between the political right to vote and the natural right to self-defense.

---

[1]    Contrary to the government's assumption, Opp'n at 13 n.8, aliens could vote in congressional elections in the late 18th century if their state permitted it, which many did. *See* Jamin B. Raskin, *Legal Aliens, Local Citizens: The Historical, Constitutional and Theoretical Meanings of Alien Suffrage*, 141 U. Pa. L. Rev. 1391, 1397–99, 1418–19 (1993). And aliens—no matter their immigration status—are considered people for the purpose of representation in the House of Representatives. *See, e.g.*, U.S. Census Bureau, "2020 Census Residence Criteria and Resident Situations," https://www2.census.gov/programs-surveys/decennial/2020/program-management/memo-series/2020-memo-2018_04-appendix.pdf (noting that "Citizens of foreign countries living in the United States" are "counted at the U.S. residence where the live and sleep most of the time"); U.S. Census Bureau, "Frequently Asked Questions (FAQs) About Foreign-Born," https://www.census.gov/topics/population/foreign-born/about/faq.html (last visited Jan. 3, 2026) (noting that among the counted are "unauthorized migrants").

## II.    The Government Has Not Established that 18 U.S.C. § 922(g)(5)(A) Is Supported by A Relevant and Similar Historical Tradition of Firearms Regulation

The government has failed to meet its burden of presenting a historical tradition that is either distinctly or relevantly similar to 18 U.S.C. § 922(g)(5)(A). *See Bruen*, 597 U.S. at 27; *Rahimi*, 602 U.S. at 692, 701. The government is unable to identify a single 18th or even 19th century law prohibiting aliens from possessing firearms. *See* Opp'n at 20–22 (conceding the absence of such laws by reframing the inquiry as one involving "illegal" aliens only). Nor can it refute the defense's historical evidence that at least some states *required* aliens to bear arms in order to serve in the militia. *See id.* at 16.[2] Instead, absent any historical statute regarding noncitizens—unlawfully present or not—the government relies on "laws barring Native Americans, Catholics, and Loyalists from bearing arms." *Id.* at 22. These unconstitutional statutes are irrelevant and do not establish a historical tradition justifying section 922(g)(5)(A).

### A.    *The government's proffered historical analogues establish no tradition*

The laws identified by the government fail to establish any historical tradition. Catholics were citizens, and the only three laws to disarm them were enacted in response to the French and Indian war that broke out in 1756 and was "perceived by many in the United Kingdom as a war between Protestantism and Catholicism." Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 WYO. L. REV. 249, 263 (2020); *cf.*

---

[2]    The government observes that the defense "cite[s] a state law that provided certain 'free white aliens' were eligible for militia duty and three state laws that . . . effectively did the same thing by not expressly exempting them from militia service." Opp'n at 16. Those statutes were illustrative and not exhaustive, because *the government*, not the defense, bears the burden to establish a historical tradition to justify its regulation. *Bruen*, 597 U.S. at 19, 27. There are others. *See, e.g.*, Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487, 509 (2004) ("In 1778 New York, the militia consisted of 'every able-bodied male person Indians and slaves excepted residing with [the] State from sixteen years of age to fifty.'" (quoting ch. 33, 1778 N.Y. Laws at 62)) (cited in Opp'n at 15).

5

Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early American: The Legal Context of the Second Amendment*, 25 LAW & HIST. REV. 139, 157 (2007) (finding Virginia was the only state to disarm Catholics) (cited in Opp'n at 15). These three pre-independence, wartime laws, two of which premised disarmament on a sworn oath of allegiance to King George III, hardly establish a tradition of regulation, let alone one within the relevant historical time period. *See Bruen*, 597 U.S. at 46 ("For starters, we doubt that *three* colonial regulations could suffice to show a tradition of public-carry regulation.").

Loyalists were also citizens, and they were disarmed in the context of the Revolutionary War, when they posed a clear and present danger of fighting on behalf of England. *See* Cornell & DeDino, *supra* at 506 (cited in Opp'n at 15). Here, too, the state governments did not disarm a class but only individuals who refused to swear an oath of allegiance and who might have borne arms against the state during active hostilities. Disarmament during the exigencies of the Revolution does not provide a regulatory tradition. *Cf. Rahimi*, 602 U.S. at 694 ("[B]y the time of the founding, however, state constitutions and the Second Amendment had largely eliminated governmental authority to disarm political opponents on this side of the Atlantic.").

Finally, like the laws disarming Loyalists, colonial laws prohibiting arming Native Americans were measures to protect the colonists in the context of ongoing hostilities:

> [I]n 1675–1675, during the great Indian uprising in New England known as King Philip's War, the Indians were "well supplied with muskets, bullets, and powder" and described as "dead shots." No wonder a Virginia statute that same year made selling arms or ammunition to Indians a crime for which the culprit was to die "without benefit of clergy" and to forfeit his estate.

Joyce Lee Malcolm, TO KEEP AND BEAR ARMS: THE ORIGINS OF AN ANGLO-AMERICAN RIGHT 140 (1996) (cited in Opp'n at 14, 15). The colonial statutes identified by

the government did not prohibit Native Americans from possessing firearms; they prohibited the people of the colonies from providing firearms to Native Americans.[3]

The "analogues" offered by the government are hardly traditional in terms of illuminating the Second Amendment right—they all involve short-lived wartime disarmament. These stand in stark contrast to the surety laws, the "going armed" laws, and the concealed carry laws the Supreme Court looked to in delimiting the Second Amendment right. *See Rahimi*, 602 U.S. at 695–97; *id.* at 697–98; *Bruen*, 597 U.S. at 53–55.

    B.    *The government's proffered analogues are not relevant*

Even if the government proffers laws that are "analogous," Opp'n at 20, that is not the end of the analysis. These laws must also be relevant. *Bruen*, 597 U.S. at 29 (noting that otherwise, "[e]verything is similar in infinite ways to everything else"). But the government has failed to show any *relevant* similarity between regulations disarming Native Americans, Catholics, or Loyalists and section 922(g)(5)(A). Relevance involves "at least two metrics": how and why the regulation burdens the right. *Id.* As a justification, the government offers that allegiance laws "serve as a mark of trustworthiness." Opp'n at 19 (quotation omitted). But "untrustworthiness" is an impermissibly vague criterion. *See Rahimi*, 602 U.S. at 701 ("[W]e reject the Government's contention that Rahimi may be disarmed simply because he is not 'responsible.' 'Responsible' is a vague term. It is unclear what such a rule would entail." (citations omitted)).

---

[3] Notably, in *Bruen*, the Court never addressed or relied on Loyalist and Catholic disarmament laws. *See* 597 U.S. at 49. In *Rahimi*, although the government presented the Loyalist laws as analogues, the Court declined to rely on Native American, Catholic, or Loyalist disarmament. *See generally Rahimi*, 602 U.S. 680. This is because these laws are not part of any historical tradition—they either appear so few times in the historical record that they do not constitute a tradition or are irrelevant as applying to nonmembers of the political community.

The government otherwise rests on speculation. *See* Opp'n at 21 (quoting *Huitron-Guizar*, 678 F.3d 1164 at 1170 ("Congress *may have concluded* that illegal aliens, already in probable present violation of the law, simply do not receive the full panoply of constitutional rights" (emphasis added))). To the extent the government's position is that section 922(g)(5)(A) is justified based on Congress's conclusion that aliens do not have Second Amendment rights, such a circular justification is no justification at all. Disarmament premised on legislative judgments alone is exactly what the Second Amendment protects against, which *Heller*, *McDonald*, and *Bruen* emphasized. *See, e.g.*, *Bruen*, 597 U.S. at 17 ("To justify its regulation, the government may not simply posit that the regulation promotes an important interest.").

Relevant historical regulations must involve instances where *a rightsholder* has been disarmed. An individual who never had the right to begin with, by definition, does not have a right "subject to well-defined restrictions." *Id.* at 39. Thus, pointing to laws that could never have been challenged under the Second Amendment vitiates the entire *Bruen* analysis: the purpose of "prov[ing] that its firearms regulation is part of the historical tradition" is to "delimit[] the outer bounds of the right to keep and bear arms." *Id.* at 19.

Relying on laws disarming Native Americans, Catholics, and Loyalists, the government argues that the underlying principle is Congress's power to disarm nonmembers of the political community. This analysis conflates historical understandings of "the people" with historical understandings of the Second Amendment. In so doing, it answers the question of who was a rightsholder, not how rightsholders were regulated.

For example, the government draws from a portion of Judge Menashi's concurrence in *Perez* that focuses on who is among "the people" but does not discuss the scope of the Second Amendment right. Opp'n at 14 (citing *Perez*, 6 F.4th at 462). It similarly relies on *Heller* to

argue that the right to bear arms under the English Bill of Rights was "restricted to Protestants" who were "Subjects." *Id.* at 15 (citing *Heller*, 554 U.S. at 593). These sources concern definitions of "the people," but say nothing about how "the people" exercising their Second Amendment rights were regulated. Laws targeting individuals who did not have the positive right to begin with offer no insight into how that right is understood. *See Bruen*, 597 U.S. at 68.

As the government acknowledges, the classifications it relies on are "abhorrent and of course would be unconstitutional today." Opp'n at 22 (quotations omitted). But the government insists that it is proper to rely on them to "show that the right to bear arms was understood to be subject to the government's limitation of that right to those within the political community." *Id.* The government's unconstitutional statutes cannot establish the constitutionality of section 922(g)(5)(A).

The government attempts to extrapolate from Native American disarmament a broader principle of noncitizen disarmament. This ignores that Native Americans were not viewed as immigrants or as individuals "outside the polity"; they were regarded with animus and treated, adjudicated, and viewed as a lesser race.[4] Native Americans were viewed as colonized subjects whose rights had been "wrested from them" under the theory of discovery and conquest. Philip P. Frickey, *Marshalling Past and Present: Colonialism, Constitutionalism, and Interpretation*, 107 HARV L. REV. 381, 387 (1993) (quoting *Johnson v. M'Intosh*, 21 U.S. 543, 589 (1823)). Native Americans generally did not reside in the colonies or subject themselves to colonial

---

[4]    While the government does not here analogize to regulations concerning enslaved persons, both enslaved persons and Native Americans were viewed, as a class, in the most degrading terms at the Founding. Any justification for their disarmament—if faithful to history—cannot be disentangled from the inherent animus behind all *de jure* treatment of enslaved persons and Native Americans, including disarmament provisions. Unless the government wishes to premise noncitizen disarmament on the same "abhorrent" justifications, analogizing to Native American disarmament has no relevance.

jurisdiction. *See, e.g.*, *Worcester v. Georgia*, 31 U.S. 515, 556–61 (1832). They were also not considered part of the population for the purpose of representation in the House of Representatives, *see* U.S. Const. Art. I § 2 ("excluding Indians not taxed"), even after ratification of the Fourteenth Amendment, *see id.*, U.S. Const. amend. XIV § 2 ("excluding Indians not taxed"). None of these criteria apply to undocumented immigrants voluntarily residing in the United States. Disarmament of Native Americans is thus so far afield from the instant case that it offers no insight into the scope of the Second Amendment right at issue.

In sum, the laws the government cites are not "well-established and representative historical analogue[s]" of section 922(g)(5)(A). *Bruen*, 597 U.S. at 30 (holding that "courts should not uphold every modern law that remotely resembles a historical analogue" (quotations omitted)). They are not well-established but were rare wartime measures addressing exigencies of antagonist foreign sovereigns. Nor are they *relevantly* analogous; they are "abhorrent" and "unconstitutional," as the government concedes, and premised on impermissibly vague justifications or derived from disarmament of those who were never rightsholders. That "[i]llegal immigration is an issue that substantially postdates the Second Amendment" changes nothing. Opp'n at 22.[5] Where a modern circumstance is involved, like the modern circumstance of domestic violence restraining orders, the government must still satisfy its burden by presenting a relevantly similar law. *See Rahimi*, 602 U.S. at 692. It has failed to do so here.

---

[5] The government asserts that "laws prohibiting illegal immigrants from bearing arms followed close on the heels of the *existence* of illegal immigrants." Opp'n at 17. But the Omnibus Crime Control and Safe Streets Act of 1968, which established the federal prohibition now codified at section 922(g)(5)(A), came nearly a century after the Chinese Exclusion Act of 1882 that government cites. *See id.* at 21.

## **CONCLUSION**

For the foregoing reasons and the reasons set forth in Mr. Aybar-Berroa's Motion, the Court should dismiss the Superseding Indictment because the conduct alleged—possession of ammunition by an alien "illegally or unlawfully" in the United States—is constitutionally protected by the Second Amendment as construed in *Bruen* and *Rahimi*.

Dated: January 5, 2026        Respectfully submitted,
      New York, New York

By: /s/ Neil Kelly
     Neil P. Kelly
     FEDERAL DEFENDERS OF NEW YORK
     52 Duane Street, 10th Floor
     New York, New York 10007
     (212) 417-8700
     neil_kelly@fd.org

     *Counsel for Christhian Aybar-Berroa*